**ALASKA PULP CORPORATION,**
**Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 95–153C.**

United States Court of Federal Claims.

Sept. 28, 1995.

---

William F. Marston, Jr., Tonkon, Torp, Galen, Marmaduke & Booth, Portland, Oregon, for plaintiff.

Jane W. Vanneman, Civil Division, Department of Justice, Washington, D.C., with whom were Frank M. Hunger, Assistant Attorney General, and David M. Cohen, Director, for defendant.

## OPINION

MARGOLIS, Judge.

This is a government contract case. Plaintiff Alaska Pulp Company (APC), moved for an order directing the contracting officer to issue a final decision on APC's claims for damages, pursuant to 41 U.S.C. § 605(c)(4). Defendant United States contends that the motion cannot be granted because the court has not issued a declaration on the propriety of the "default termination" of APC's contract, the contracting officer lacks authority to consider the claim, and in any event, the contracting officer has not engaged in undue delay.

## FACTS

APC and the United States, through the Forest Service, executed a 50–year timber sale contract, Contract No. 12–11–010–1545, on October 15, 1957. The contract provided for the harvesting and processing of timber by the plaintiff in the Sitka region of the Tongass National Forest in Alaska. Pursuant to its contract, APC constructed a dissolving pulp mill in Sitka, Alaska. The stated purposes of the contract included the development of an industrial enterprise in Alaska and the sale of timber for use by the enterprise.

On September 30, 1993, APC indefinitely suspended operations at its dissolving pulp mill in Sitka. By prior letter dated June 30, 1993, APC had identified the enactment of the Tongass Timber Reform Act (TTRA), the Forest Service's unilateral modifications to the contract made thereunder (Unilateral Terms), and adverse market conditions as the primary causes of the suspension. The Regional Forester indicated, by letter dated July 1, 1993, that he would like to discuss any ideas concerning how to minimize the economic impact of the shutdown on the region. On September 24, 1993, the Regional Forester wrote that he believed that closure of the pulp mill would be a material breach of the contract. On October 21, 1993, APC sent a letter to the Regional Forester discussing possible alternatives to the operation of the pulp mill. The letter stated that APC had been discussing with the Forest Service the possibility of constructing a facility for the manufacture of Medium Density Fiberboard (MDF).

By letter dated October 22, 1993, APC responded to the Regional Forester's letter of September 24, 1993. APC argued that suspending the pulp mill was not a breach because the contract did not prevent APC from "changing the nature of its industrial enterprise over time as economic forces dictated." APC believed that economic consid-

erations had changed. APC also argued that "even if APC had some obligation to operate a particular facility, that obligation had been excused by the Forest Service's actions implementing unilateral changes to APC's long-term contract." The Forest Service responded on January 13, 1994, that APC's October responses established that APC is repudiating the contract. The Forest Service demanded that APC show cause why the contract should not be terminated for material breach.

APC responded to the government's show cause letter by a letter dated February 10, 1994. APC argued that it was not repudiating the contract. APC made a number of arguments. First, its actions were protected by the contract's *force majeure* clause. Second, a switch to a MDF manufacturing facility would be consistent with the contract. Third, APC renewed its objections to TTRA and the Unilateral Terms implemented thereunder.

On April 14, 1994, the Regional Forester, who also served as the CO, wrote APC that its indefinite shutdown of the pulp mill breached the contract, such breach gave the Forest Service the right to terminate the contract, and the Forest Service is terminating the contract. The government reasoned that the current indefinite shutdown was not permitted by the contract. In addition, the Forest Service concluded that even if an MDF plant would be acceptable, APC had not made a firm commitment to its construction. The letter stated that it was the final decision of the contracting officer, and it discussed APC's appeal rights.

On December 23, 1994, APC submitted to the CO a document consisting of 38 pages of factual discussion and legal argument and several hundred pages of exhibits. The cover page stated, in large bold letters, that it was a "claim" under the contract. The document requested a final decision of the CO pursuant to the Contract Disputes Act, 41 U.S.C. § 605 (CDA). The certified claim sought $1,058,086,583. Essentially, APC's claim consisted of a number of separate claims. First, the Forest Service breached the settlement contract by imposing the Unilateral Terms which allegedly destroyed the contract's economic viability. Second, the termination decision was a material breach of the express terms of the contract and the duty of good faith and fair dealing. This assertion was based in part on the Forest Service's alleged failure to properly consider MDF conversion. Third, the decision to terminate was a breach because it was not an independent decision made by the contracting officer, but was rather the product of political pressure from superiors. Fourth, TTRA and the implementation of the Unilateral Terms constituted a taking of APC's contract.

On February 21, 1995, the contracting officer notified APC that it might not issue a final decision on APC's money claims until June 16, 1995. On March 3, 1995, APC filed a complaint in this court. The complaint asked the court to declare that the termination of the contract was improper for a number of reasons including the following: (1) APC was not in material breach of the contract, (2) APC's obligations had been excused by the government's prior breach of the contract, and (3) the government breached its duty of good faith and fair dealing. APC argued that the implementation of TTRA and the Unilateral Terms was a prior government breach excusing APC's obligations. In addition, the termination itself constituted a breach of contract because of the government's failure to consider MDF conversion, the language of the contract, and the CO's failure to make an independent decision. Also on March 3, 1995, APC submitted a motion requesting that the court establish a deadline for the CO's decision on APC's money claims of December 23, 1994.

## DISCUSSION

Pursuant to the CDA, this court, as "the tribunal concerned," has the power to order the contracting officer to issue a final decision on a claim within a specified period of time in cases of undue delay by the contracting officer. 41 U.S.C. § 605(c)(4). APC alleged that the final decision is being unduly delayed because the contracting officer already effectively denied APC's money claims

when it terminated APC for material breach of contract.[1]

*Prudential Considerations*

■ The government responds by challenging the contracting officer's ability to consider APC's money claims. First, the government argues that APC's money claims are premature because the court has not ruled on the propriety of APC's termination for breach of contract. In the government's view, the court must find that a breach of contract or default termination is wrongful or excused before a contractor can submit a proposal for a money claim, which then can ripen into a claim for money damages (or termination for convenience costs in applicable cases) after a dispute ensues. The government believes that this result is required by the Tucker Act, 28 U.S.C. § 1491(a)(1), sound policy, judicial efficiency, the CDA and the dispute requirement. The government's position is without merit. The equivalent argument, raised in the context of an appeal from a default termination coupled with a claim for termination for convenience costs, has been repeatedly rejected by this court. *Ran–Paige Co. v. United States*, Nos. 93–274C *et al.*, slip op. at 4 (Fed.Cl., Sept. 14, 1994); *Boeing v. United States*, 31 Fed.Cl. 289, 295–97 (1994); *see Cincinnati Electronics Corp. v. United States*, 32 Fed.Cl. 496, 503 (1994) (taking jurisdiction over a complaint amended to add a claim for termination for convenience costs to an appeal from a default termination). The defendant has not advanced, and the court cannot perceive, a principled reason for treating the competing breach claims raised in this case differently from the cited cases. The court adopts the thorough reasoning in *Boeing*, 31 Fed.Cl. at 295–97.

*Statutory Preclusion of a CO's Decision*

■ The government next argues that the contracting officer lacks the authority to issue a final decision on APC's money claims pursuant to 28 U.S.C. §§ 516–20. Under this statutory scheme, the United States De-

partment of Justice gains exclusive authority over a CDA claim filed in this court, which divests the CO of the power to issue a final decision on the same claim. *Sharman Co., Inc. v. United States*, 2 F.3d 1564, 1571 (Fed.Cir.1993). *Sharman* held that a government claim[2] for unliquidated progress payments, following a default termination, was precluded because it was the same as the contractor's *quantum meruit* claim for those same progress payments. The contractor's progress payments claim was raised in a complaint filed before the CO's decision on the government's progress payment claim. *Id.* at 1571–72. The court reasoned that the two claims for the unliquidated progress payments were the same because they "allege[d] entitlement to the *same money* based on the *same partial performance*, only under a different legal label." *Id.* at 1571 (emphasis added). *Sharman* establishes that the touchstone for the operation of the statute is whether the particular CDA claim is already in litigation by the filing of a complaint. *Id.* at 1571–72. Because the statute has the potential for disruptive effects, it "must be narrowly construed." *Hughes Aircraft Co. v. United States*, 534 F.2d 889, 901, 209 Ct.Cl. 446 (1976); *see Sipco Services & Marine Inc. v. United States*, 30 Fed.Cl. 478, 485 (1994). The precision of *Sharman's* same money, same partial performance test follows this principle of narrow construction.

■ Here, the government has "terminated" APC's contract because closing the pulp mill is allegedly a material breach. This is a government claim, *see* 41 U.S.C. § 605(a) (distinguishing contractor and government claims); *Malone v. United States*, 849 F.2d 1441, 1443 (Fed.Cir.1988) (standard termination for default is a government claim), which was placed into litigation when APC appealed the contracting officer's termination decision in its complaint of March 3, 1995.

■ The government argues that APC's appeal of the default termination triggers statutory preclusion because the complaint

---

1. The Federal Acquisition Regulation (FAR) does not apply to the contract. 48 C.F.R. §§ 1.103, 2.101, 33.203(a) (1994). Therefore, the standard default termination clause was inapplicable.

2. As a general matter, the term claim "refers 'to each claim under the CDA for money that is one part of a divisible case.'" *Id.* at 1569 (*quoting Joseph Morton v. United States*, 757 F.2d 1273, 1281 (Fed.Cir.1985)).

makes essentially the same allegations asserted in APC's money claims before the contracting officer. However, these claims are not the same. First, this court has repeatedly drawn a distinction, for purposes of the 28 U.S.C. §§ 516–520 analysis, based on whether the two claims assert entitlement to the same money. *See Ran Paige,* slip op. at 7; *Cincinnati Electronics,* 32 Fed.Cl. at 504; *St. Paul Fire and Marine Ins. Co. v. United States,* 39 C.C.F. ¶ 76,706, at 89,466, 1994 WL 518856 (Fed.Cl.1994) (as modified on reconsideration) (unpublished); *Boeing,* 31 Fed.Cl. at 292. *But see Tecom Indus., Inc. v. United States,* 24 Cl.Ct. 611, 614 (1991). In other words, the analysis focuses on "the identity between the complaint and the CO's decision [or pending decision] in terms of the *precise quantum of relief sought."* *Boeing,* 31 Fed.Cl. at 292 (emphasis added). Here, the government's termination claim, and APC's appeal thereof, does not assert any monetary damages. In contrast, APC's money claims assert entitlement to over one billion dollars. On this point alone, the government's claim and APC's money claims are not alleging entitlement to "the same money." *Sharman,* 2 F.3d at 1571. Moreover, even if the government had asserted a money claim as its remedy for breach, its damages probably would have differed in nature and amount from plaintiff's because the government's damages would have been based on its own, distinct expectancy interest.

Second, similarities between the allegations raised in APC's complaint, which is the appeal of the government's breach claim, and APC's monetary claims are not dispositive: "an overlap of legal and factual issues be-tween that which is in court and that which is put in issue by a claim pending before the CO is not enough." *Boeing,* 31 Fed.Cl. at 293. Applying the same partial performance prong of the *Sharman* test, there is a fine distinction between the performance events underlying the claims: the government's claim focuses on the closure of the mill as the breach event while the bulk of APC's claims focus on the "termination" decision as the breach event.

*The Dispute Requirement*

The government has suggested that APC's monetary claims are not predicated on a preexisting dispute. In a filing dated September 11, 1995, defendant indicated that, based on *Reflectone, Inc. v. Dalton,* 60 F.3d 1572 (Fed.Cir.1995), it would not pursue this argument. In addition, the court finds there was, in fact, a preexisting dispute.

*The Time For the Contracting Officer's Decision*

The contracting officer wrote that he would issue a final decision by June 16, 1995. This deadline has passed. Moreover, the disagreement between the parties began at the administrative level as early as September 24, 1993. Under the authority of 41 U.S.C. § 605(c)(4), the contracting officer is directed to issue a final decision on APC's monetary claims by November 13, 1995.